2015 WL 512624 (C.A.8) (Appellate Brief)
United States Court of Appeals, Eighth Circuit.

UNITED STATES OF AMERICA, Appellee,

v.

James Robert CARLSON, Appellant.

No. 14-2986.
January 29, 2015.

Appeal from the Judgment and Sentence of the District Court for the
District of Minnesota, The Honorable, David S. Doty, Senior District Judge

**Appellant's Brief and Addendum**

Mark D. Nyvold, 7671 Central Ave. NE, Suite 207, Fridley, MN 55432, (763) 276-9173, for appellant.

### *I  SUMMARY AND REQUEST FOR ORAL ARGUMENT

A jury convicted Appellant Carlson of one count of conspiracy to commit various offenses against the United States, delivery of misbranded drugs received in interstate commerce, doing acts resulting in drugs being misbranded while held for sale, distribution of a controlled substance, conspiracy to distribute controlled-substance analogues, distribution of controlled-substance analogues, and monetary transactions in property derived from specified unlawful activity.

The District Court sentenced Carlson to a total term of 210 months. This appeal challenges the constitutionality of the Analogue Act, denial of an entrapment-by-estoppel defense, use of inadmissible expert-testimony, erroneous jury instructions on the misbranding and drug-analogue counts, insufficient evidence of drug distribution, erroneous imposition of a firearm enhancement, use of the wrong drug-conversion ratio, and the impact of reversal on the drug counts of the money-laundering counts and the forfeiture judgment.

Carlson requests oral argument, and asks that the Court grant each party 20 minutes.

### *ii  TABLE OF CONTENTS

| | |
|---|---|
| Summary and Request for Oral Argument ............................................................................................ | i |
| Table of Authorities ..................................................................................................................... | iii |
| Jurisdictional Statement ................................................................................................................ | 1 |
| Statement of Issues ...................................................................................................................... | 1 |
| Statement of the Case ................................................................................................................... | 3 |
| Summary of the Arguments .............................................................................................................. | 5 |
| Arguments | |
| I. The District Court erred in denying Carlson's motion to dismiss the analogue counts because the analogue law provides no notice of what acts are criminal and permits arbitrary enforcement, contrary to the Due Process Clause. .................................................................................................................. | 9 |
| II. The District Court erred when it decided that Carlson could not meet the entrapment-by-estoppel defense's requirements, thereby denying him his Sixth Amendment rights to testify and present a defense, and have the jury decide the fact-issues his defense presented. ................................................ | 16 |
| III. The District Court abused its discretion when it denied Defendants' *Daubert* challenge to permitting Dr. Boos's testimony -- used by the Government to prove substantial similarity between the chemical structures of the alleged analogues and controlled substances -- because Boos's underlying methodology was not shown to be reliable. ............................................................................................ | 35 |

UNITED STATES OF AMERICA, Appellee, v. James..., 2015 WL 512624 (2015)

IV. As to the misbranding counts, the Court erred in not instructing that Carlson must know the meaning of misbranding under the FDCA. ........................................................................................... 42

*iii* V. The District Court's *Turcotte* instruction, applicable to all the analogue counts, unfairly prejudiced Carlson and denied him a fair trial. ................................................................................... 44

VI. The evidence that -- after JWH-018 had been scheduled -- Carlson knowingly distributed it, as Count 18 alleged, did not suffice to convict him. .................................................................................. 45

VII. At sentencing, the District Court clearly erred when it applied the THC-to-marijuana conversion ration of 1 to 167 to determine Carlson's offense level, and when it added two levels because it believed Carlson had used firearms in connection with the drug offenses. ............................................... 55

VIII. The final forfeiture order and judgment and the money-laundering convictions must be vacated if the drug-count convictions on which they are predicated are vacated. ............................................... 69

Conclusion

Certificate of Compliance ............................................................................................................ 71

Index to Addendum ...................................................................................................................... 72

*iv*  **TABLE OF AUTHORITIES**

*Cases*

*Connally v. Gen. Constr. Co.*, 269 U.S. 385, 46 S.Ct. 126 (1926) .... 10

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993) ...... 35-40

*Garionas v. Newton*, 827 F.2d 306 (8th Cir. 1987) ........................... 69

*Lauzon v. Senco Products, Inc.*, 270 F.3d 681 (8th Cir. 2001) .......... 35

*Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883 (1988) .......... 24

*Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240 (1952) ....... 24

*Peitzmeier v. Hennessey Industries*, 97 F.3d 293 (8th Cir. 1996) ...... 37

*Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257 (1959) .......................... 16, 30

*Russell v. Whirlpool Corp.*, 702 F.3d 450 (8th Cir. 2012) ................. 35, 38, 40

*Stevenson v. FCI Waseca*, 383 Fed.Appx. 587 (8th Cir. 2010) ......... 67

*United States v. Achter*, 52 F.3d 753 (8th Cir. 1995) ........................ 16, 25

*United States v. Ansaldi*, 372 F.3d 118 (2nd Cir. 2004) .................... 11

*United States v. Aquino-Chacon*, 109 F.3d 936 (4th Cir. 1997) ......... 24, 25

*United States v. Austin*, 915 F.2d 363 (8th Cir. 1990) ...................... 30

*United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624 (1980) ............ 24

*United States v. Batterjee*, 361 F.3d 1210 (9th Cir. 2004) ................ 28

*v* *United States v. Bamberg*, 478 F.3d 934 (8th Cir. 2007) ................ 11

*United States v. Benning*, 248 F.3d 772 (8th Cir. 2001) ................... 16

*United States v. Chavez-Alvarez*, 594 F.3d 1062 (8th Cir. 2010) ...... 52

*United States v. Desura*, 865 F.2d 651 (5th Cir. 1989) ..................... 11

*United States v. Fedida*, 6:12-cr-209, 2013 WL 2712363 (M.D. Fla. June 11, 2013) ...... 39-40

*United States v. Fiorito*, 640 F.3d 338 (8th Cir. 2011) ..................... 66

*United States v. Fisher*, 289 F.3d 1329 (11th Cir. 2002) .................. 11

*United States v. Forbes*, 806 F.Supp. 232 (D. Col. 1992) ................. 12

*United States v. Godsey*, 690 F.2d 906 (8th Cir. 2012) .................... 55

*United States v. Kendrick*, 423 F.3d 803 (8th Cir. 2005) ................. 24

*United States v. Parker*, 267 F.3d 839 (8th Cir. 2001) ..................... 26

*United States v. Perez-Guerrero*, 334 F.3d 778 (8th Cir. 2003) ....... 63

*United States v. Redest*, 512 F.3d 1067 (8th Cir. 2008) ................... 44

*United States v. Swink*, 21 F.3d 852 (8th Cir. 1994) ........................ 24

🚩 *United States v. Turcotte*, 405 F.3d 515 (7th Cir. 2005) .................... 11, 12

🏳 *United States v. Washam*, 312 F.3d 926 (8th Cir. 2002) .................... 9, 11

🏳 *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920 (1967) .................. 16

**United States Constitution**
Amendment VI ....................................................................... *passim*

 **\*vi  United States Code**

🏳 21 U.S.C. 802(32)(A) ............................................................ 10

21 U.S.C. 813 ....................................................................... 10

🏳 21 U.S.C. 841 ..................................................................... 69

🏳 21 U.S.C. 846 ..................................................................... 69

**Federal Rules of Criminal Procedure**
Rule 29 ............................................................................... 45

**United States Sentencing Guidelines**
2D1.1 ................................................................................. 55-57, 60, 61
2D1.1, App. Note 6 ................................................................ 55, 60
2D1.1(b)(1) .......................................................................... 63, 64

**Code of Federal Regulations**
28 CFR 550.58(a)(1)(vi)(B) ..................................................... 67

### *1  JURISDICTIONAL STATEMENT

Appellant Carlson appeals from the judgment and sentence of the United States District Court for the District of Minnesota, the Hon. David S. Doty, presiding. The Government invoked the District Court's jurisdiction by indictment under 18 U.S.C. §3231.

The District Court Clerk entered judgment on the docket on August 15, 2014. Carlson filed his notice of appeal on August 22, 2014, timely under Federal Rule of Appellate Procedure 4(b).

Carlson invokes this Court's jurisdiction under 🏳 28 U.S.C. §1291, 🚩 18 U.S.C. 3742, and Rules 3 and 4 of the Federal Rules of Appellate Procedure.

### STATEMENT OF THE ISSUES

I. Did the District Court err in denying Carlson's motion to dismiss the analogue counts because the analogue law provides no notice of what acts are criminal and permits arbitrary enforcement, contrary to the Due Process Clause?

🏳 *United States v. Forbes*, 806 F.Supp. 232 (D. Col. 1992)

II. Did the District Court err when it decided that Carlson could not meet the entrapment-by-estoppel defense's requirements, thereby denying him his Sixth Amendment rights to testify and present a defense, and to have the jury decide the fact-issues his defense presented?

🏳 *Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257 (1959)

*United States v. Achter*, 52 F.3d 753 (8th Cir. 1995)

*United States v. Swink*, 21 F.3d 852 (8th Cir. 1994)

**\*2** 🏳 *United States v. Austin*, 915 F.2d 363 (8th Cir. 1990)

UNITED STATES OF AMERICA, Appellee, v. James..., 2015 WL 512624 (2015)

III. Did the District Court abuse its discretion when it denied Defendants' *Daubert* challenge to permitting Dr. Boos's testimony -- used by the Government to prove substantial similarity between the chemical structures of the alleged analogues and controlled substances -- where Boos's underlying methodology was not shown to be reliable?

🏴 *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993)

🏴 *Lauzon v. Senco Products, Inc.*, 270 F.3d 681 (8th Cir. 2001)

🏴 *Peitzmeier v. Hennessey Industries*, 97 F.3d 293 (8th Cir. 1996)

IV. As to the misbranding counts, did the Court err in not instructing that Carlson must know the meaning of misbranding under the FDCA?

🏴 *United States v. Hiland*, 909 F.2d 1114 (8th Cir. 1990)

V. Did the District Court's *Turcotte* instruction, applicable to all the analogue counts, unfairly prejudice Carlson and deny him a fair trial?

🏴 *United States v. Sullivan*, 714 F.3d 1104 (8th Cir. 2013)

🚩 *United States v. Turcotte*, 405 F.3d 515 (7th Cir. 2005)

VI. Did the evidence that -- after JWH-018 had been scheduled -- Carlson knowingly distributed it, as Count 18 alleged, suffice to convict him?

🏴 *United States v. Redest*, 512 F.3d 1067 (8th Cir. 2008)

VII. At sentencing, did the District Court clearly err when it applied the THC-to-marijuana conversion ration of 1 to 167 to determine Carlson's offense level, and when it added two levels because it believed Carlson had used firearms in connection with the drug offenses?

**\*3** *United States v. Godsey*, 690 F.3d 906 (8th Cir. 2012) Gdln. 2D1.1, App. Note 6

*United States v. Perez-Guerrero*, 334 F.3d 778 (8th Cir. 2003)

VIII. Must the final forfeiture order and judgment and the money-laundering convictions be vacated if the drug-count convictions on which they are predicated are vacated.

*Garionas v. Newton*, 827 F.2d 306 (8th Cir. 1987)

***STATEMENT OF THE CASE***

*Relevant procedural history*.

Carlson's trial began September 17, 2013 on the Amended Superseding Indictment (DCD 281) charging him with:

conspiracy to commit offenses against the United States (Count 1); causing misbranded drugs to be introduced into interstate commerce (Counts 2-10) and so delivered (Counts 11-16); doing acts resulting in drugs being misbranded while held for sale (Count 17); distribution of a controlled substance (Count 18); conspiracy to distribute a controlled substance (Count 21); distribution of controlled-substance analogues (Counts 22-30), monetary transactions in property derived from specified unlawful activity (Counts 33-55). [1]

**\*4**  On October 7, 2013, the jury convicted Carlson on all but drug counts 19-20 and money-laundering counts 31-32. On August 14, 2014, the District Court sentenced Carlson to 210 months, a $4,500 special assessment, a $25,000 fine, and a forfeiture consisting of a money judgment for $6,532,125.48 jointly and severally with co-defendant Lava Haugen, two snowmobiles, two vehicles, and two pieces of real property.

*Rulings presented*. Carlson presents these rulings for review: 1) the Analogue Act is vague; 2) entrapment by estoppel as to the analogue counts; 3) erroneous admission of expert testimony; 4) erroneous jury instructions on the misbranding and drug analogue counts; 5) insufficient evidence of drug distribution on Count 18; 6) sentencing errors in applying a firearm enhancement and use of the wrong drug-conversion ratio; and effect of drug-conviction reversals on the money-laundering convictions and the forfeitures.

*Relevant facts*.

Under Federal Rule of Appellate Procedure 28(i), Carlson adopts here by reference the part of Co-Appellant Gellerman's Statement of the Case summarizing the trial testimony, at Gellerman brief pp. 11-52.

## \*5  SUMMARY OF THE ARGUMENTS

I. *Unconstitutionally vague analogue statute*

The Analogue Act's terms "substantially similar in chemical structure and pharmacological effect" do not enable persons to determine when they are violating the law. Unlike cases where law or regulations had provided notice as to what could be an analogue, as applied to Carlson, no such notice existed for the substances alleged as analogues. It does not alleviate this lack of notice that a court, as Carlson's did, allows the jury to determine an alleged analogue's chemical structure by pharmacological effect, where the latter may not, and need not, and here did not have any relationship to the former.

II. *Exclusion of entrapment-by-estoppel defense*

A DEA official who, responding to statements she knew Carlson had made in a radio interview they participated in -- including Carlson's statement that after a ban on certain chemicals' effective date he would sell still-legal chemicals -- said Carlson was correct. Carlson hence reasonably concluded his actions were legal. Because Carlson showed he could raise jury-questions on the entrapment-by-estoppel-defense elements, the jury, not the judge, had to decide that defense. Just the existence of evidence allegedly inconsistent with the defense did not justify the Court's excluding it.

**\*6**  III. *Inadmissible expert testimony*

DEA chemist Boos's methodology did not satisfy any *Daubert* reliability-factor, but the Court admitted his opinion-testimony on the element of substantial similarity in chemical structure, common to all the analogue counts (21-30). The absence of testing, peer review, publication and an error-rate determination made Boos's methodology unreliable. And once admitted, his opinion could not be adequately challenged, because cross-examination cannot take the place of the process *Daubert* establishes to

assess reliability. Without Boos's opinion, the Government had inadequate proof of substantial similarity, but at the least the unreliable testimony prejudicially affected the verdict and denied a fair trial.

IV. *Erroneous misbranding jury instruction*

The Court's instruction on the misbranding counts (1-17) erroneously failed to instruct, as Carlson had requested, that the Government had to prove that he knew the meaning of misbranding, *i.e.*, that the substances he was selling were drugs regulated by the FDA and thus concerned the FDA, and that he knew what constituted misbranding. Adequately instructed, the evidence would not have supported convicting Carlson on these counts.

**\*7** V. *Erroneous analogue-count jury instruction*

The Court erred in instructing the jury that, for the analogue-count elements, the jury could infer substantial similarity in chemical structure from substantial similarity in pharmacological effect, even though effect may have no connection to structure, and even though the controlled substance to which the alleged analogue is allegedly similar as to chemical structure need not be the same controlled substance as to which the alleged analogue is allegedly similar in effect.

VI. *Insufficient evidence of drug distribution*

The evidence did not suffice to convict Carlson of knowingly distributing the scheduled controlled substance in Count 18, where no jury could reasonably conclude that Carlson had not sent products containing that substance back to the manufacturer prior to the alleged distribution.

VII. *Clear error in imposing firearm enhancement in use of drug-conversion ratio*

The record shows that Carlson's possession of firearms in his own store, where legitimate business activities occurred, was no different from any other store-owner who legally possesses a firearm for protection of self, employees and property at the business, and thus it was clearly improbable that the firearms were connected to the sale of products the jury found to be analogues, but that Carlson in good-faith believed were legal to sell.

**\*8** The Court clearly erred in using a 1:167 THC-to-marijuana conversion ratio (THC substituted for the analogue-quantity) where the ratio premises THC's concentration in marijuana as much lower than research supports, and where Carlson presented factual support for a 1:7 ratio.

VIII. *Effect of drug-count reversals on money-laundering convictions and forfeiture*

Because Carlson's drug convictions provide the basis for the money-laundering convictions and the forfeiture order and judgment, if the drug convictions are reversed the latter must be, too.

## **\*9   ARGUMENT**

**I The District Court erred in denying Carlson's motion to dismiss the analogue counts because the analogue law provides no notice of what acts are criminal and permits arbitrary enforcement, contrary to the Due Process Clause.**

### *Standard of review*

This Court reviews *de novo* a constitutional challenge to a federal statute. 🗎 *United States v. Washam*, 312 F.3d 926, 929 (8th Cir. 2002).

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES OF AMERICA, Appellee, v. James..., 2015 WL 512624 (2015)

*The resolution below of Carlson's challenge to the Analogue Act's constitutionality.*

Carlson before trial sought dismissal of the analogue counts because, as applied to him, the Analogue Act provided no notice that the substances charged in the Amended Superseding Indictment were analogues (Motion, DCD 96, p. 2). The Magistrate recommended denying this motion (Report and Recommendation (R&R) DCD 226, at App. Add. 31-38). The Court adopted the recommendation and denied the motion (Order, DCD 275, at App. Add. 8-9).

*Applicable constitutional principles*

A statute is void for vagueness if it "forbids or requires the doing of an act, and in terms so vague that men of common intelligence must necessarily guess at  **\*10**  its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126 (1926). A two-part test, applicable to the defendant's facts, determines vagueness: 1) the law must provide adequate notice of what is proscribed, and 2) the statute must not lend itself to arbitrary enforcement. *United States v. Bamberg*, 478 F.3d 934, 937 (8th Cir. 2007).

*The analogue law's unconstitutional vagueness*

The Federal Analogue Act, at 21 U.S.C. 813, says an analogue of a controlled substance, to the extent the former is intended for human consumption, will be treated for purposes of any Federal law as a Schedule I controlled substance. An analogue (i) has a chemical structure "substantially similar" to that of a controlled substance in Schedules I or II, and (ii) a stimulant, depressant or hallucinogenic effect on the central nervous system substantially similar or greater than that of a Schedule I or II controlled substance.

Alternatively to (ii), the substance is an analogue if a person intends the substance, or represents that the substance, will have an effect as in (i). 21 U.S.C. 802(32)(A).

 **\*11**  The Act is vague because the terms "substantially similar in chemical structure pharmacological effect" do not enable a persons to determine when they are violating the law.

Carlson's vagueness challenge recognized that numerous courts have denied vagueness challenges, including the Eighth Circuit., *e.g.,* *Washam, id.*, 312 F.3d at 933. But many cases had in common that either the Analogue Act's legislative history, or the statute prohibiting the controlled substance at issue, or a regulation, or a prior case suggesting or indicating a substance to be an analogue, and had thus provided notice the substances were analogues.

These cases include *United States v. Fisher*, 289 F.3d 1329, 1337-38 (11th Cir. 2002) (Persons of ordinary intelligence were aware that the alleged analogue would metabolize upon ingestion into a controlled substance); *United States v. Ansaldi*, 372 F.3d 118, 122-23 (2nd Cir. 2004) (chemical had been listed in CSA as subject to registration requirements); *United States v. Turcotte*, 405 F.3d 515, 528 (7th Cir. 2005) (Congress and DEA had provided notice the substance was an analogue); *United States v. Desura*, 865 F.2d 651, 653 (5th Cir. 1989) (Analogue Act's legislative history showed that alleged analogue MDMA was one of the reasons for analogue law); *United States v. Bamberg*, 478 F.3d at 937 (finding it **\*12**  relevant that Congress in proposed rules said substance at issue was an analogue). Carlson's vagueness argument said no such notice had been provided him, or by the DEA, or was otherwise available, as in these cases.

Carlson's vagueness argument said that absent this notice, the Analogue Act had been found unconstitutionally vague, and cited *United States v. Forbes,* 806 F.Supp. 232 (D. Col. 1992). *Forbes* focused on the absence of scientific consensus that the alleged analogue at issue was substantially similar to a controlled substance, and the absence of scientific consensus on to the methodology to be used to determine structural similarity, even within the DEA. *Id.,* at 237, 234. *Forbes* also cited Congress's intent that the Analogue Act alleviate the problem of underground chemists creating new substances that are not illegal, not making illegal substances that predated the Analogue Act's enactment. *Id.,* 237-38. So did *United States v. Turcotte,* 405 F.3d at 523.

Carlson also asserted below he had not been given any notice that any substance charged in his case was or could be an analogue, as the temporary ban imposed on March 1, 2011 applied to only five chemicals, none of which were charged in his later indictment as analogue substances (Memorandum, DCD 137, p. 30).

**\*13   *The District Court's analysis does not answer Carlson's vagueness challenge.***

The District Court in rejecting Carlson's vagueness argument said only that the Magistrate correctly applied Eighth Circuit precedent that had found no vagueness (Order, DCD 275, at App. Add. 8-9). We have just distinguished, however, Eighth Circuit and other Circuit's precedents. And looking at the Magistrate's analysis in closer detail, to the extent the preceding argument has not already addressed it, the analysis did not address the problems with the Analogue Act that result in denial of notice as to what the law prohibits, and the opportunity for arbitrary enforcement this creates.

For example, the Magistrate says that the notice Carlson says the analogue law does not provide has been incorporated into the offense elements, one of which requires that defendants know they possess an analogue substance (R&R, at App. Add. 33). But this ignores that, as the Court permitted in Carlson's case, the jury can find knowing possession based on a *Turcotte* instruction, since under the Analogue Act the controlled substances do not have to be the same in both parts of this test. That is how the Court instructed Carlson's jury (DCD 297, pp. 74-75). (Vol. XI, 2527-30). [2]

**\*14**   *Turcotte* allows a jury to find substantial similarity in chemical structure between the alleged analogue and a controlled substance if the alleged analogue is also substantially similar in pharmacological effect to a controlled substance, even though the similarity in pharmacological effect of two substances does not reliably indicate similar chemical structure. 405 F.3d at 527.

Even more problematically, the controlled substance to which the Government claims the alleged analogue is substantially similar in pharmacological effect need not be the same controlled substance to which the Government claims the alleged analogue is substantially similar in chemical structure. *Id.*

Thus, if the Government claims a substance is substantially similar in chemical structure to THC -- a psycho-active components of marijuana -- but it has a pharmacological effect substantially similar to cocaine, the jury can infer that the substance is nonetheless substantially similar in chemical structure to THC.

On these terms, the requirement that defendants must be shown to have knowledge that the substance is an analogue does not provide notice. Under a *Turcotte* rationale, it puts people in a position of having to guess, and hope, that a substance that does not appear to be substantially similar in chemical structure to  **\*15**  any controlled substance is also not substantially similar in pharmacological effect to *any other* Schedule I or II controlled substance. This scenario essentially precludes notice, and makes arbitrary enforcement the norm.

And it is especially unreasonable and unfair to find notice adequate when knowledge that a substance is an analogue can be established via a *Turcotte* instruction, since *Turcotte* justified its reasoning in part on Congress and the DEA having previously

provided notice that the substance in *Turcotte* alleged to be an analogue was an analogue. 🚩405 F.3d at 528. No such notice existed in Carlson's case.

Carlson's convictions on the analogue counts must be reversed because they rest on an unconstitutionally vague statute.

**\*16  II The District Court erred when it decided that Carlson could not meet the entrapment-by-estoppel defense's requirements, thereby denying him his Sixth Amendment rights to testify and present a defense, and have the jury decide the fact-issues his defense presented.**

### Standard of review

This Court reviews *de novo* a ruling excluding a defense of entrapment by estoppel, *United States v. Benning,* 248 F.3d 772, 775 (8th Cir. 2001), and to the extent the ruling relies on factual findings, reviews them for clear error. *Id.*

### Case law relevant to the entrapment by estoppel defense

Entrapment by estoppel occurs when an official assures a person that conduct is legal and the person reasonably relies on that, and initiates or continues the conduct. *United States v. Achter,* 52 F.3d 753, 755 (8th Cir. 1995); 🏳️*Raley v. Ohio,* 360 U.S. 423, 438-49, 79 S.Ct. 1257 (1959). It involves an official unintentionally but mistakenly misleading a person into violating the law. *Id.*

A person has a Sixth Amendment right to testify, present a defense and testify to support it. 🏳️*Washington v. Texas,* 388 U.S. 14, 18, 87 S.Ct. 1920, 1923 (1967) (State-law rule that persons charged as principals or accomplices cannot testify for each other violated the Sixth Amendment rights to compulsory process and to present a defense).

### \*17  The issue's procedural posture

Before trial, Carlson moved to dismiss Counts 21-30 of the Amended Superseding Indictment (the analogue conspiracy and substantive analogue-distribution counts), asserting entrapment by estoppel (DCD 96, p. 2, III. D), which the Magistrate recommended denying (R&R (DCD 226), at App. Add. 38-40). Carlson said public officials had said the non-scheduled substances in the products Carlson was selling were legal. The District Court agreed with the Magistrate, finding that no one had personally told Carlson his conduct was legal, so any claimed reliance was unreasonable (Order, DCD 275, at App. Add. 8).

Carlson, however, moved *in limine* to present his entrapment-by-estoppel defense (DCD 262). The Government objected (DCD 258, 278). The Court, citing its Order adopting the Magistrate's recommendation not to grant the defense motion to dismiss, excluded the defense, including the alternative theory that the statements went to his state of mind, as discussed ahead (Vol. I, 86, 105, 115-17, 124-25).

At case's end, Carlson's counsel said Carlson would not testify, citing "this Court's ruling that he would be unable to testify as to his belief induced by the Government that his conduct was unlawful (Vol. X, 2202). The Court said "I think I understand your comment" (Vol. X, 2202).

 \*18  The Court questioned Carlson about testifying. Carlson said he would not because "I don't think I'd be able to say everything that's caused the reasons for what I've done... Klobuchar, the police dept., the DEA agents...." (Vol. X, 2204). The Court told Carlson that counsel had made clear "the reasons... that you don't wish to testify. *Id.* Carlson agreed. *Id.*

Carlson, post-trial, sought a new trial on the analogue counts (21-30), citing exclusion of his defense (DCD 311 motion; 312 Memorandum). Denying the motion, the Court said it "merely rehashes the entrapment by estoppel and mistake of law arguments that the court rejected when considering the defendant's pre-trial motions and motions *in limine*" (DCD 362, at App. Add. 61).

### *Issue on appeal*

The issue here is not whether the jury should have believed Carlson's entrapment-by-estoppel defense, and that it should have resulted in an acquittal. Carlson did not even get to present the defense, so the issue is whether he should have been allowed to, where he met the foundational requisites, and where excluding it denied him his Sixth Amendment right to present a defense and testify to support it, and whether he should get a new trial.

Carlson does not challenge here the pretrial ruling on his indictment-dismissal motion asserting entrapment by estoppel. But to the extent the District **\*19** Court's ruling relied on the reasoning and authority it cited in denying Carlson's pretrial motion to dismiss the indictment, Carlson challenges here that reasoning and authority, too.

### *What Carlson proffered*

Carlson proffered the statements of legislative officials who had made statements beginning in 2011 that substances of the sort that were in the products he and others were selling were legal, needed to be banned, and discussed legislation that would do that (DCD 262, pp. 9-36).

Carlson also proffered he had relied on statements DEA Spokeswoman Carreno had made in radio interview, in which she addressed in her official capacity statements Carlson had made just before she spoke in the interview (DCD 262, pp. 36-37). Carlson's counsel, when arguing his *in limine* motion, cited Carreno's statements to Carlson as among those he wanted to present to support the entrapment defense (Vol. I, 117).

Carlson does not concede here that the statements made by legislative officials were not relevant to his entrapment-by-estoppel defense, but in this appeal he focuses on the Court's exclusion of Ms. Carreno's statements, because the circumstances show they met all of this Circuit's requirements for the entrapment-by-estoppel defense, and even requirements other Circuits have.

**\*20** We reproduce below the *in limine* motion's relevant text and motion's quoted matter (a news article) as they appeared in Carlson's *in limine* motion (DCD 262, pp. 36-37), which included Carlson's proffer of what he and Carreno would testify to:

**DEA Official Spokeswoman Barbara Carreno.**
On March 1, 2011 JWH-018 was placed in Schedule I of the Controlled Substances Act. The manufacturers who supplied Defendants had switched the active ingredient in what Defendants were selling to AM-2201, a substance that was not included in the DEA's Temporary Order placing five (5) synthetic cannabinoids into Schedule I. On March 1, 2011, Defendant James Carlson had a dialogue with the DEA through Minnesota Public Radio. Defendants heard the audio of the dialogue, with Defendant James Carlson speaking first, and then DEA Barbara Carreno, a DEA spokeswoman in Washington, responding to what Defendant James Carlson said. Defendants also viewed the dialogue on the Minnesota Public Radio website which is set forth in a United Press International (*sic*) Copyrighted story. The substance of what Defendants saw on the Minnesota Public Radio website is set forth in full below.

**Minn. head shop owner says fake pot ban won't work**

March 1, 2011

UNITED STATES OF AMERICA, Appellee, v. James..., 2015 WL 512624 (2015)

Duluth, Minn. (AP) -- The owner of a Duluth head shop says a new federal ban on the sale of five chemicals used to make synthetic marijuana won't make much difference - he'll just stock brands that use other, still-legal substances.

Jim Carlson, owner of the Last Place on Earth, said he will still stock top-selling brands of fake pot, which contain organic leaves coated with chemicals that provide a marijuana-like high when smoked.

"We're just going to pull in the ones with different compounds - and they are readily available," Carlson told the Duluth News Tribune. **\*21** Synthetic marijuana has been sold in drug paraphernalia shops and on the Internet under various brands including Spice, K2, Blaze and Red X Dawn. The Drug Enforcement Agency's ban, imposed Tuesday, affects only five chemicals used in the products.

Carlson said that with about 210 similar chemicals available, the manufacturers will try to keep one step ahead of the government

"Unfortunately he is correct," said Barbara Carreno, a DEA spokeswoman in Washington, who confirmed Tuesday that many suppliers are offering retailers products with new chemicals. "There are many of these substances and we chose five common ones because we don't have the resources to study all of them."

Federal drug officials announced plans for the emergency measure in November amid increasing reports of bad reactions including seizures, hallucinations and dependency. The ban is scheduled to remain in place for at least one year while researchers study the five chemicals.

Neither the banned chemicals nor the other ones that might take their place in synthetic marijuana products have been tested in humans, Carreno said, so nothing definitive is known about their short- or long-term effects on people. She said it's dangerous for people to ingest these substances when they don't know what the physical or psychological effects will be.

Synthetic marijuana is a "highly profitable business," Carreno said, but most of the chemicals come from overseas, and many retailers have no idea what the active ingredients in the products are, and they may buy from dishonest suppliers. So that makes it even harder for consumers to [....]

### REDACTED [3]

(Copyright 2011 by The Associated Press. All Rights Reserved.) [4]

**\*22** Based on what Carreno said in responding to Carlson, Carlson also proffered in his *in limine* motion (DCD 262, pp. 39-41) that he and his co-defendants would testify at trial that, as summarized here, they believed:

1. Carreno had authority to make the statements she made because she was the official DEA spokeswoman, she had all the relevant historical facts because the DEA has over 10,000 employees that work full time on drug enforcement and drug related issues, and has a wide variety of experts to deal with all aspects of synthetic marijuana;

2. Carreno's statements in her dialogue with Carlson were communicated to them through multiple channels of communication, including on the radio, in the newspapers and postings on the internet;

3. the sale of AM-2201 and the other 210 synthetic cannabinoids referred to by Carlson in the interview were legal after March 1, 2011;

4. the DEA only intended to outlaw substances that were in the DEA's March 1, 2011 order;

5. the DEA had no evidence of other products' effects and thus could not conclude that other products were analogues of those just scheduled;

6. the DEA would be testing and then outlawing other synthetic-marijuana chemicals harmful to the public and would notify the public if it discovered **\*23** synthetic chemicals like those alleged in the Superseding Indictment or the other 210 synthetic-marijuana chemicals were illegal;

7. they (Defendants) were operating within the law because they dealt only with responsible manufacturers they believed to be honest, and required a certified lab-report showing no banned or illegal substances in the products they sold to accompany each shipment, and did their own spot-check lab tests to ensure the reports were accurate;

8. they could rely on Carreno's statements in continuing to sell so-called synthetic-marijuana products after March 1, 2011, and in their subsequently selling the substances alleged in the Superseding Indictment, and substances labeled as "incense" or "bath salts," "not for human consumption," and

9. they could so rely because the information came from DEA official Carreno, and the DEA never provided any notice that the reasonable conclusions to be drawn from her statements as to the legality of the substances later alleged in the Superseding Indictment was erroneous.

### *The Court erred by deciding Carlson's defense instead of letting the jury do so.*

Had Carlson told the Court he had evidence that contradicted or undercut the Government's witnesses's testimony, and thus the Government should be **\*24** prevented from calling them, the Court would have said the jury gets to decide that. So it should have been with Carlson's defense, because it had factual and legal support. *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886 (1988) (Entrapment generally presents a jury question).

Defendants must be permitted to present an affirmative defense if it meets the minimum standard for each defense-element. *United States v. Bailey*, 444 U.S. 394, 415-17, 100 S.Ct. 624, 637 (1980); *United States v. Kendrick*, 423 F.3d 803, 807 (8th Cir. 2005) (Entrapment presents a fact-question generally left to the jury). And disposing of affirmative defenses purportedly because no evidence supports them is disfavored. *United States v. Aquino-Chacon*, 109 F.3d 936, 939, n.3 (4th Cir. 1997).

And in *United States v. Swink*, this Court ruled that where Swink's father had exculpatory evidence that Swink had not understood the bond transaction at issue, the trial-court's ruling precluding the father's testimony denied Swink his right to present a defense. 21 F.3d 852, 855-56 (8th Cir. 1994). *Swink* held the jury should have decided whether Swink knew his conduct was illegal, not the judge. *Id.*

The Supreme Court in *Morissette v. United States* ruled that the trial court had incorrectly excluded evidence and argument on Morissette's claim he had not **\*25** criminally converted property because he had innocent intention, having thought the property had been abandoned. To support this ruling, *Morissette* said juries are not bound by what might seem to judges to be inescapable logic. 342 U.S. 246, 275, 72 S.Ct. 240, 256 (1952). The reasons for excluding Carlson's defense were far from inescapable.

### *No basis to exclude Carlson's defense*

This Circuit has no applicable model instruction for entrapment by estoppel, but precedent says a person must show that an official assured him or her that certain conduct is legal, the person reasonably relied on that advice, and continued or initiated the conduct. *United States v. Achter*, 52 F.3d at 755.

The record shows that the testimony Carlson proffered he would give, and the other proffered evidence, like Carreno's testimony (Vol. I, 117), would have raised entrapment-by-estoppel fact-issues for the jury on each of that defense's required elements. As discussed next, the Court's reasons for excluding that defense do not hold up.

### Carreno was an official authorized to make the statements

What has been discussed so far makes apparent that Carlson would have been able to show that Carreno participated in the interview and responded, as a **\*26** DEA spokeswoman, to his statements, and she thus had authority make the statements she did.

### Carlson could show that Carreno addressed her statements to him

The first reason the Court gave in its Order affirming the Magistrate's denial of Carlson's pretrial motion was that Carlson had never personally been told his conduct in selling the non-scheduled substances charged in the Amended Superseding indictment was legal. (Order, DCD 275, at App. Add. 8). This was a clearly-erroneous factual finding.

To the extent "personally" means a face-to-face conversation, none of the cases the Magistrate and the Court cited, or any case at the Circuit-level dealing with this defense, requires that, *e.g., United States v. Parker*, 267 F.3d 839, 844 (8th Cir. 2001) (R & R, at App. Add. A39). But Carlson here assumes, without agreeing, that to show entrapment by estoppel the statement(s) at issue had to be personally addressed to the person, because Carreno did address her statements to him.

The proffered MPR article shows that in response to Carlson's statements, which make up the article's first five paragraphs, Carreno said "Unfortunately, he is correct." Carreno could not have thought that Carlson was not still listening, or would not learn of her comments, which responded directly to his during the same **\*27** radio interview. And Carlson proffered that he had read in the news what Carreno had said in her part of the interview, and relied on it. See point 8 of Carlson's proffer, above. When, as here, an official makes clear to whom the official is speaking or responding, the two need not be face to face.

Carlson had sufficient evidence to create a jury-question on this element.

### Carlson had evidence he relied on the statements, and did so reasonably.

The Court precluded Carlson's defense also because "any claimed reliance on public statements was not reasonable." Like its first reason for precluding the defense, the Court imported this from its ruling denying Carlson's motion to dismiss the analogue counts based on entrapment. Order (DCD 275, at App. Add. 8). But that order addressed a motion to dismiss counts, not whether Carlson could support this issue at trial as a defense.

And Carlson had proffered that he relied on what Carreno had said, as he said in the above-summarized defense proffer, points 2 and 8, above. He did rely, because he distributed products containing the alleged analogues. Because of Carreno's affirmatively misleading statements, whether Carlson relied and the reasonableness of doing so presented jury fact-questions.

The Government responded to Carlson's *in limine* motion by saying he had unreasonably relied on what Carreno had said, because he knew about the **\*28** Analogue Act. Carlson said in his *in limine* motion he knew of DEA Deputy Administrator Rannazzisi's April, 2011 Congressional testimony, in which Rannazzisi said synthetic cannabinoids are labeled "not for human consumption" to circumvent the Analogue Act (DCD 278, p. 5).

First, Carlson knowing about the Analogue Act only made all the more reasonable his reliance on what Carreno said, because he could reasonably assume that, as a DEA spokeswoman, she knew about the Act, and that if it applied to what he planned to do, she would have said that, or at least said it could apply. But she did not.

Second, Rannazzisi's above-referenced statement did not even address the substance of the Carlson-Carreno interchange -- Carlson's statement that once a substance came under a ban he would use other, *still-legal* substances, and Carreno's "unfortunately, he's right" response. Carlson merely knowing that Rannazzisi had said false labeling is an effort to circumvent the Analogue Act just presented a question for the jury as to reasonable reliance, not a ground for the judge to exclude the defense.

### *Carlson had evidence that Carreno knew the relevant facts*

Unlike the Ninth Circuit case the Magistrate cited, 📁 *United States v. Batterjee*, 361 F.3d 1210, 1216 (9th Cir. 2004) (R & R, at App. Add. 40), no Eighth Circuit **\*29** case requires that the statements have been made by a person with knowledge of all the relevant historical facts. But the record shows Carreno nonetheless had that knowledge.

In the MPR radio interview, Carlson spoke about his business and said in response to the just-imposed and any future ban he would switch to one or more of the numerous, still-legal substances available. Carreno obviously knew what the radio interview would involve, and either heard what Carlson said, or had it related to her, as indicated by her "unfortunately, he's correct" response to the first five paragraphs of the MPR news-article about the interview. So a fact-question existed that she knew the relevant facts. The jury had to be allowed to decide this question.

Because the District Court adopted the Magistrate's ruling denying the motion to dismiss the analogue counts for entrapment by estoppel, and even though that ruling did not decide the different question of whether Carlson's could present entrapment as a defense at trial, we also address here a point the Magistrate made in his R&R that the Court did not reference. At footnote 34 in the R&R, at App. Add. 40, the Magistrate says Carreno made no statement that the substances charged in this case, as analogues, were legal to sell, only that other, not-yet scheduled substances were readily available.

 **\*30**  This reasoning ignores that Carlson had said in the radio interview that 210 chemicals were available. Carreno's broad "unfortunately he's correct" statement had responded to this Carlson statement, too. Given his reference to so many chemicals being available, no one in his position would reasonably have thought Carreno had to identify by name every substance that he might switch to for him to be able to reasonably assume that her "unfortunately-he's-correct" response to the future conduct he described applied to any substance that had not yet been scheduled. Again, this countering evidence only created a question for the jury in deciding the defense, not grounds for the judge to bar it.

And it makes no difference to resolving the defense-preclusion issue here that a violation of the controlled-substance law requires no specific intent to violate the law. If a government official tells a person his or her conduct is legal, it makes no difference that the law does not require the defendant to have acted with knowledge of and intent to break the law. The official's statement that the contemplated conduct is legal implants in one's mind the belief that no criminal sanctions at all will attend the conduct.

The Due Process Clause applies in this circumstance to preclude prosecution. 📁 *United States v. Austin*, 915 F.2d 363, 366 (8th Cir. 1990), citing 📁 *Raley v. Ohio*, 360 U.S. at 426.

### *\*31  Court's ruling that proof of intent to entrap had to be shown*

The Court further erred because it believed Carlson had to prove intent to entrap (Vol. I, 105). [5]  The Court referenced Senator Klobuchar's statements as not having been made with this intent (Vol. I, 106). Even though Carlson here does not rely on those statements, the Court's incorrect belief of what constitutes entrapment by estoppel applied to the statements Carlson relied on from any source.

Carlson opposed his entrapment-by-estoppel evidence's exclusion (Vol. X, 2202, 2204), which included the alternative theory Carlson asserted: that the DEA's Ms. Carreno saying what he planned to do was legal reasonably led him to believe that the substances he was selling, like AM-2201, were in fact not substantially similar to any scheduled substance, otherwise would not have made the statements discussed above (Vol. I, 108). The Court's exclusion also included the alternative state-of-mind theory the proffered evidence supported.

### *Prejudicial effect of excluding the proffered evidence*

Because Carlson's entrapment-by-estoppel evidence created a fact-question on all the defense-elements this Circuit requires, and those it doesn't, *de novo* reviews shows that the Court prejudicially erred in excluding the defense instead of **\*32** letting the jury decide it. The Government's argument that evidence inconsistent with Carlson's entrapment claim existed could not justify removing the defense from the jury, at least in the face of Carlson's Sixth Amendment right to present a viable defense. The Court's ruling also denied Carlson his right to testify, which he would have had the defense not been excluded because his testimony would have related to the excluded defense.

The excluded evidence, particularly as it established entrapment by estoppel, would have provided a basis to acquit on all the analogue counts on which the jury convicted (21-30). Indeed, the significance of Carreno's statements to Carlson's defense cannot be overstated, because she made them before any of the charged analogue crimes occurred. The Count 21 analogue conspiracy allegedly began March 1, 2011, and the substantive analogue distribution offenses charged in Counts 22-30 began began Aug. 10, 2011.

The Court's error thus was not harmless beyond a reasonable doubt. It made the trial unfair, so the verdict does not reliably indicate guilt.

The prejudice also affected the sentence. Carlson asked for a downward variance, premised partially on his good-faith, Government-induced belief that his sale of substances the Government alleged were analogues were not (Sent. trans., 138). Carlson Sentencing Memorandum (DCD 415, pp. 5-12).

 **\*33** The District Court would not consider this request, saying

> The question you're now putting before the Court has been dealt with by the jury; that is, the good faith. The jury heard evidence of Carlson's activity and whether he had a good faith belief and they found him guilty and so that issue is beyond us.

(Sent. trans., 139).

Counsel disagreed, saying the jury had heard no such evidence because the Court had excluded it, and referenced the Court's ruling on Carlson's *in limine* motion, discussed above (*Id.*, 139-40).

Counsel was correct. The Court had not admitted evidence of Carreno's statements, or anyone else's, or Carlson's responses to them, so the jury had not even had the opportunity to reject Carlson's good-faith belief. And Carlson provided case-law support for using one's good-faith belief in the legality of his conduct to determine whether to vary downward from the Guideline range suggested by PSR (Sentencing Memorandum, DCD 415, pp. 5-12).

The Court varied downward from the Guideline range of life, sentencing Carlson to 210 months. But that lengthy sentence did not negate or even mitigate the exclusion of Carlson's defense, or the Court's error in precluding consideration of Carlson's good faith. Because the variance could well have been lower had the Court considered this departure-ground, the Court's rulings prejudiced him at sentencing, too.

 **\*34**  The Court abused its discretion when it excluded Carlson's defense and denied his Fifth and Sixth Amendment rights to a fair trial. Carlson must be retried on the analogue counts to let him present his defense. Even if for some reason this Court does not order a new trial on this basis, it should remand for re-sentencing because the Court incorrectly thought that the jury had resolved the good-faith issue.

**\*35  III The District Court abused its discretion when it denied Defendants' *Daubert* challenge to permitting Dr. Boos's testimony -- used by the Government to prove substantial similarity between the chemical structures of the alleged analogues and controlled substances -- because Boos's underlying methodology was not shown to be reliable.**

### *Standard of review*

This Court reviews for an abuse of discretion a trial court's ruling on the expert-testimony admissibility. *Russell v. Whirlpool Corp.*, 702 F.3d 450, 455 (8th Cir. 2012).

### *What Daubert requires*

To be admissible under Fed. R. Evid. 702, expert testimony must rest on a reliable methodology, reliably applied. *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993) created non-exclusive factors to determine that: 1) Can, and has, the expert's technique been tested, has it been peer-reviewed or published, has a known or potential rate of error been determined, and does the method have general acceptance in the scientific community? 509 U.S. at 593-94, 113 S.Ct. at 2786.

And a caselaw-derived factor asks whether the expert derived the technique for litigation-purposes, or if it flowed naturally from research without a litigation connection. *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 687 (8th Cir. 2001).

### *\*36  The Daubert-inquiry testimony.*

The parties discussed how they would proceed on a challenge to an expert witness's testimony (Vol. I, 49-50). The experts would provide their qualifications, followed by a *voir dire* under *Daubert* outside the jury's presence. Then the Court would rule on any *Daubert* challenge to admissibility (Vol., I, 50-51).

After defendants' counsel *voir dired* Boos about the methodology underlying his opinion (Vol. VII, 1524-34), the Court ruled Boos could testify, because he is an expert in organic chemistry, and his testimony would help the jury (Vol. VII, 1536-37).

Co-Appellant Gellerman's Statement of the Case brief -- which Carlson in his own Statement of the Case has adopted by reference under Fed. R. App. P. 28(i) -- summarizes at pages 32-34 Appellants' *Daubert* inquiry. We rely on it here. The inquiry showed that despite Boos being a Ph.D. chemist, and having experience determining chemical structures, he could not satisfy even one *Daubert* factor.

Boos testified he makes his chemical-structure comparisons using visual inspection and knowledge, and then gives a subjective opinion (Vol. VII, 1526-- 27). No objectively-accepted criteria in the scientific community exist for making these comparisons

UNITED STATES OF AMERICA, Appellee, v. James..., 2015 WL 512624 (2015)

(Vol. VII, 1527). His method has not been subjected to **\*37** peer review, nor been published (*Id.*). He had only discussed it with DEA scientists in his own section (Vol. VII, 1527--28). His comparison-methodology could not be tested because it represented only his opinion (Vol. VII, 1530). And Boos had developed no method to determine the rate at which his method could produce erroneous comparison-results (Vol. VII, 1531).

### *The Court erred in admitting Boos's testimony.*

In ruling Boos's testimony admissible, the Court gave no recognition to Boos not meeting any *Daubert* factor, saying only that it had listened to everything presented, that no admissibility-matrix exists, and Boos's testimony would be helpful (Vol. VII, 1536). But the *Daubert* reliability analysis exists to substantiate helpfulness, or not. The *Daubert* factors are non-exclusive, and no one is mandatory, but Boos's method did not satisfy any of them. This scenario required exclusion of Boos's testimony.

⚑ *Peitzmeier v. Hennessey Industries*, 97 F.3d 293 (8th Cir. 1996) affirmed a summary-judgment dismissal that had rested on the court having found that Peitzmeier's expert's testimony inadmissible under *Daubert*. This Circuit agreed, because the methodology underlying the testimony the expert would give about the tire-changer that had injured Peitzmeier satisfied no *Daubert* factors, and thus lacked reliability. ⚑ *Id.* at 297-98.

 **\*38** Even if it were possible for methodology-reliability could be shown on some other basis other than the enumerated *Daubert* factors, the Government did not do so here. Boos's doctorate and work on structural similarity hardly sufficed. That just begged the question whether his work used a reliable methodology.

Accordingly, assuming the Court even considered the above-discussed *Daubert* factors, Boos's methodology not satisfying any of them shows that the Court clearly abused its discretion in letting him testify on substantial similarity of chemical structure *Russell v. Whirlpool Corp., id.*, 702 F.2d at 455 (abuse of discretion occurs when a court considers all and only proper factors, but commits a clear error of judgment).

And Boos's method's close connection to litigation further shows an abuse of discretion, because Boos uses his unverified, unexamined method to support the substantial-similarity conclusions he gives in drug-analogue cases (Vol. I, 1535). His research and supporting methodology not flowing naturally from disinterested research suggests a biased methodology. ⚑ *Lauzon*, 270 F.3d at 687, 692. And Boos and the DEA have good reason to not do anything to facilitate outside scientific-scrutiny, because that could provide grounds to challenge Boos's opinions.

It further shows an abuse of discretion that, upon prosecution objection, the Court struck Carlson's *voir dire* questions to Boos asking whether, in a case called **\*39** United States v. Fedida, all seven non-DEA scientists who testified disagreed with his methodology (Vol. VII, 1532-33). The Government said the question did not relate to qualifications. *Id.* But the *Daubert* inquiry exists to determine methodology-reliability, so other scientists disagreeing with Boos was proper inquiry. The Court's striking the questions was highly inconsistent with what *Daubert* involves, and shows the Court did not fully grasp *Daubert*.

It also facilitated the Court's abuse of discretion here that the Government told the Court:

Every Eighth Circuit case to have had an analogue case has found that this testimony is admissible under *Daubert:* ⚑ *McKinney* [79 F.3d 105], ⚑ *Washam* [312 F.3d 926], *Bamberg* [478 F.3d 934], *Orchard* [323 F.3d 1133], every Eighth Circuit case.

There's never been a case in any circuit that has excluded the testimony of Mr. Boos or anyone from his section in an Analogue Act case on *Daubert* grounds. And *McKinney* explained it exactly how he just explained it, that that is sufficient.

(Vol. VII, 1535).

Even if Boos testified in these cases, none of them on appeal addressed a *Daubert* ruling, let alone one involving Boos, or even said *Daubert* had been raised below. And while no Circuit may have excluded Boos's testimony, we have found no Circuit case that has reviewed a Boos *Daubert*-ruling. We located only a district court order addressing Boos in a *Daubert* context, *United States v. Fedida*, **\*40** 6:12-cr-209, 2013 WL 2712363 (M.D. Fla. June 11, 2013), at App. Add. 64. It denied a motion to preclude Boos's testimony as unreliable. The order, which did not address *Daubert*, could not bind our court, nor can it bind this Circuit. 🗂 *Peitzmeier*, 97 F.3d at 298, n.3.

The incorrect sense the Court had that Boos's methodology had been challenged under *Daubert* but upheld by the Circuit Courts very likely prejudicially affected its decision to admit Boos's testimony, despite no *Daubert*- factor having been satisfied.

### Prejudice

An erroneous *Daubert* ruling requires relief if it was clear and prejudicial to the proceeding's outcome. 🗂 *Russell*, 702 F.3d at 455. That happened here, because the Court erroneously admitted unreliable scientific testimony to prove the substantial-similarity-in-chemical-structure offense-element. That could not have been proven that without Boos's testimony. And cross-examination of him did not obviate the prejudice, because once he testified the jury was free to believe his testimony, cross-examination aside.

Furthermore, cross-examination by a non-scientist counsel cannot effectively expose any methodological flaws, especially where counsel starts with no knowledge of Boos's secret methodology, nor can it substitute for the peer **\*41** review, publication and testing process that could take years or months to expose flaws. Only excluding Boos's testimony would have sufficed.

Because without Boos's inadmissibly unreliable testimony the Government would not have had sufficient proof of substantial similarity in chemical structure to obtain convictions on the analogue counts. At the very least, his erroneously-admitted testimony unfairly prejudiced Carlson because it influenced the jury to convict on those counts, which denied Carlson a fair trial and makes analogue verdicts unreliable. Carlson must be re-tried on those counts.

### \*42  IV As to the misbranding counts, the Court erred in not instructing that Carlson must know the meaning of misbranding under the FDCA.

Carlson here adopts under Fed. R. App. P. 28(i) Co-Appellant Haugen's Argument I, which presents the above-stated argument.

Carlson supplements Haugen's argument as follows. Carlson objected to the instructions discussed in Haugen's argument, joining at Vol. 10, 2267 her previously stated objection.

Haugen's Brief cites at page 36 the instruction she requested on misbranding, citing DCD 287, p. 2. Carlson's counsel was a signatory to it and joined in the request.

### Prejudice

The misbranding instruction's not requiring knowing what misbranding requires prejudiced Carlson because a proper instruction would have resulted in Carlson's acquittal of misbranding, on the evidence at trial.

Case Agent Kulick testified that labeling is required when a substance meets the FDA definition of "drug," but Kulick conceded that the FDA definition is very broad (Vol. VI, 1083), and that the FDA never sent Carlson any warning letter that what he was selling was misbranded (Vol. VI, 1087).

**\*43**  Kulick admitted that tobacco is the only smoke product regulated by the FDA (Vol. VI, 1118). He was shown an FDA flyer, Defense Ex. 6 (at Appellant's Joint Appendix (AJA), A27) sent to LPOE stating that the FDA regulates certain tobacco products, but not herb products (Vol. VI, pp. 1115--16). Kulick admitted the law does not require labels for herbs that are smoked (Vol. VI, p. 1116).

Fawaz Kanaan, one of Carlson's suppliers, testified that manufacturers put labels on products, and that Carlson was not involved in that (Vol. VII, 1431). It was Kanaan's decision how to label products. *Id.*

And defense counsel pointed out in his closing that the evidence showed that Carlson had made numerous public statements that the herbs he was selling were not regulated but should be (Vol. XI, 2446).

The objected-to instruction denied Carlson a fair trial on the misbranding counts.

### **\*44  V The District Court's *Turcotte* instruction, applicable to all the analogue counts, unfairly prejudiced Carlson and denied him a fair trial.**

Under Fed. R. App. P. 28(i), Carlson here incorporates Co-Appellant Haugen's Argument II, which addresses the above-stated argument.

Carlson supplements Haugen's argument as follows. Carlson objected to the instructions, joining at Vol. 10, 2317, 2324, 2327-30 her previously-stated objection.

#### *Prejudice*

The *Turcotte* instruction denied Carlson a fair trial because the inference it permitted the jury to draw reduced the Government's burden from proof beyond a reasonable doubt on the element of substantial similarity in chemical structure to something far lower than that, denying him of the right to be proven guilty beyond a reasonable doubt. That mattered, because no evidence existed that Carlson knew he was dealing with substances structurally similar to controlled substances. His emails and other communications may express an awareness of the Analogue Act, but the Government had no evidence proving beyond a reasonable doubt that Carlson had any knowledge that what he was selling was structurally similar to a controlled substance.

### **\*45  VI The evidence that -- after JWH-018 had been scheduled -- Carlson knowingly distributed it, as Count 18 alleged, did not suffice to convict him.**

#### *Standard of review*

This Court reviews *de novo* the sufficiency of the evidence the trial judge assessed in denying a defendant's motion for judgment of acquittal, and that same evidence as assessed by the jury in reaching its verdict of guilty. This review takes the evidence in a light most favorable to the Government, and asks whether a reasonable jury could have found the defendant guilty. *United States v. Redest*, 512 F.3d 1067, 1070 (8th Cir. 2008).

#### *The motion for acquittal*

After the defense case, Carlson made a Rule 29 motion for acquittal on all Counts (Vol. IX, 1987), and renewed it at the end of the case (Vol. X, 2219). The Court took the motion under advisement. *Id.* After the verdicts, Carlson filed a motion for acquittal

and supporting memorandum of law (DCD, 333, 334). The Government opposing the motion (DCD 346), and Carlson replied (DCD 354). The Court denied the motion (DCD 362, p. 6).

**\*46  *The evidence underlying the conviction***

The DEA temporarily scheduled JWH-018 effective March 1, 2011 (Vol. V, 951). The Amended Superseding Indictment in Count 18 charged that on Aug. 10, 2011, Carlson knowingly and intentionally distributed a mixture or substance containing a detectable amount of 1-Pentyl-3-(1-naphthoyl) indole (JWH-108), a controlled substance.

At trial, drug-task force officer Esterbrook testified that on Aug. 10, 2011 he bought a package of a substance called "Maya Blue" at Carlson's business, Last Place on Earth (hereafter LPOE) (Vol. III, p. 423). Its later analysis showed it contained JWH-018. Govt. Ex. 185B, at AJA, at A1. Esterbrook identified Co-Defendant Gellerman as the person who waited on him and recommended it (Vol. III, p. 423). Carlson did not make the sale (Vol. III, 423).

The Government in opening statement said that after the DEA banned JWH-018 on March 1, 2011, the substances Carlson sold, with a few limited exceptions, [like the sale alleged in Count 18], involved other substances, because he had switched to AM-2201 (Vol. II, 200).

The Government, as in all controlled-substance cases, had to prove that Carlson knew what it was he had, JWH-018, so the Court so instructed:

> At the time of such distribution, the Defendant knew that the substance distributed was JWH-018....

**\*47**  (Vol. XI, p. 2525).

But ample evidence exists that Carlson beginning March 1, 2011 had switched from JWH-018 and gotten rid of the products containing it, so that its presence in his inventory on Aug. 10, 2011 was unknowing on his part:

First, Government witness Sherry Anderson, a former Carlson LPOE employee, testified that after a substance came under a ban, Carlson would stop selling it (Vol. IV, 717-18). So did Government witness Jamie Anderson, another former LPOE employee (Vol. V, 889). Carlson would then have Anderson box up the product containing the banned substance and return it to the supplier (Vol. IV, 718). The Government thus had no evidence that sufficed to permit a reasonable jury to conclude that Carlson knowingly distributed, or aided and abetted the distribution, of JWH-018 after the DEA temporarily scheduled it on March 1, 2011.

Second, documents seized at LPOE under a search warrant on Sept. 21, 2011 resulted in the Government obtaining reports of lab analyses that LPOE had had performed on products it was buying, to ensure it was not selling banned substances. The reports reflect sampling dates of Sept. 13 and Dec. 21 and 27, 2011 -- close in time to the alleged Aug. 10, 2011 distribution -- and all list JWH-018 as "not detected." These reports are part of multi-document Govt. Ex. 166  **\*48**  (AJA, A4-A6). Another report, with a sample date of Aug. 15, 2011, and received as Defense Ex. 4, likewise showed no JWH-018. AJA, A7.

And LPOE employee Jamie Anderson testified that although he did not know if every product Carlson sold had behind it a chemical-test report that said "no law prohibits this product," a lot of them did (Vol. V, 890).

It further supports Carlson's insufficiency argument that one of his suppliers, Government witness Fawaz Kanaan, testified that Carlson had told him he wanted lab reports with every shipment he received, and Def. Ex. 1 [no longer available, but the same

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

as Def. Ex. 4] was an example of the reports that Kanaan said he usually sent with every shipment, even without being asked (Vol. VII, 1432). [6] For all the products he shipped Carlson, Kanaan wanted to be able to assure him that no product he received had any banned substances in it (Vol. VII, 1433).

Third, the substantive *analogue*-distribution Counts, 22-30, allegedly occurred between Aug. 10, 2011 and Sept. 21, 2012, and the Count 21 conspiracy to distribute drug *analogues* is alleged to have occurred between March 1, 2011 and Sept. 21, 2012. But Govt. Ex. 185B, a list of substances allegedly distributed between March 1, 2011 and Sept. 21, 2012, shows that the only distribution of an **\*49** allegedly non-analogue controlled substance in this time-frame was the Count 18, Aug. 10, 2011 alleged distribution of JWH-018. See Ex. 185B, at AJA, A1-A3. [7]

Hence, JWH-018's appearance at this time is anomalous, which further demonstrates that Carlson had no knowledge that what his employee sold contained JWH-018. Its sale on Aug. 10, 2012 is far more consistent with the package containing JWH-018 having been unknowingly retained rather than disposed of after the March 1, 2011 ban.

Fourth, although the Government charged Carlson as an aider and abettor in Count 18, it is still significant that he did not make the Aug. 10, 2011 sale. So the Government had no evidence in the form of statements or actions by Carlson to the customer admitting or indicating he knew it contained JWH-018, nor was there any evidence that the person who made the sale said it contained JWH-018.

### The Government's argument

In response to Carlson's acquittal-motion, the Government cited Ms. Anderson's testimony (Vol. IV, 718-20) that over time there were multiple changes **\*50** in the chemicals in the products Carlson sold, and that eventually, once a product was removed from sale because it had been banned, it was no longer sent back to the supplier, but kept in boxes in the basement (Govt. Response to Acquittal Motion, DCD 346, p. 16).

The Government argued in response to Carlson's acquittal-motion that because he later kept products containing a banned substance, doing so must have occurred after the first ban that affected him. The Government says this first ban was the City of Duluth's, in 2010. Govt. Response. *Id.* The Government then argues that this meant that Carlson had to have already begun retaining for "under the table sales" products containing banned substances by the time the March 1, 2011 DEA-imposed ban went into effect. Therefore, he must have knowingly had JWH-018 to sell on Aug. 10, 2011. *Id.*

But this argument rests on several erroneous factual premises. First, the Government never asked Ms. Anderson whether Carlson, in response to the City's ban, returned the products containing the banned substances. And her later testimony made clear that in response to that ban Carlson returned no products. To the contrary, after filing his lawsuit against the City, he sold the banned substances for the remainder of that day (Vol. IV, 757). Then he went to neighboring **\*51** Hermantown to sell the banned substances, because it had no ordinance prohibiting what he sold (Vol. IV, 756).

Furthermore, Carlson and the City of Duluth stipulated on in 2010, in response to Carlson's lawsuit against the City, that its ordinance-enacted ban on the sale of products containing ingredients like JWH-018 would not be enforced against Carlson. (Vol. VI, 1153-55, Agent Kulick testimony; Defense Ex. 8 Stipulation, at AJA, A8. [8]

So not only did Ms. Anderson's testimony never specifically identify the Duluth ban as the one in response to which Carlson began returning banned substances, it could not have been that ban. The first ban in response to which Carlson returned products containing a banned substance would have been the March 1, 2011 one, which banned JWH-018. And Kulick testified that before Sherry Anderson left LPOE on Aug. 15, 2011, no other substances were added to the list of federally-scheduled substances (Vol. VI, 1123).

Kulick also admitted that the evidence showed that when the Federal Government banned a substance Carlson by and large quit using it (Vol. IV, 1125). Thus, even if Carlson later retained banned substances and sold them to certain customers, those sales would not have knowingly involved JWH-018 because they **\*52** would have occurred after his return of products containing JWH-018, in response to the March 1, 2011 ban.

Ms. Anderson also testified that she once saw Carlson's son, Joey Gellerman, sell a banned substance, and that he sold it in a brown paper bag. But she never testified what the banned substance was, she did not know the date she saw this transaction, and she wasn't even sure if this was a sale (Vol. IV, 756). This hardly demonstrates that after Carlson on March 1, 2011 got rid of all the products that contained JWH-018 he knowingly retained some for sale.

The Government also argued against Carlson's acquittal motion that he had been willfully blind in selling JWH-018 on Aug. 10, 2011, because he could and should have tested the product to make sure it was not scheduled. But Carlson was not wilfully blind here. Willful blindness requires deliberate ignorance, *i.e.*, awareness of facts that put a person on notice that the defendant's actions were particularly likely to be criminal, but failed to investigate the facts. *United States v. Chavez-Alvarez*, 594 F.3d 1062, 1068 (8th Cir. 2010).

But Carlson had returned all of the products that contained JWH-018 months earlier. And he was having products tested during the same time-frame as the Aug. 10, 2011 sale. That of the 43 products purchased undercover between Aug. 10, 2011 and Sept. 21, 2012 only one contained JWH-018 (see Govt. Ex. 185B, at **\*53** AJA, A1-A3) supports the unknowing nature of Carlson's sale of JWH on Aug. 10, 2011, and the absence of deliberate ignorance.

Finally, the Government may cite an email Carlson wrote on Sept. 3, 2011 in which he says some product was sold containing a banned substance, but that this had occurred without his knowledge, and that the product had labeling that said it was Minnesota compliant. See Govt. Ex. 152, at AJA, A10-A11. However, Carlson also says in the email that the company that sold him the product was claiming the Government had tampered with the substance. *Id.* And not only did this email not indicate Carlson was knowingly selling banned substances, it was written three weeks after the undercover purchase had occurred, which was Aug. 10, 2011.

Nor did the email deal with what was sold then to Esterbrook, or otherwise make any admissions that Carlson knew that he or anyone else at LPOE had knowingly sold a banned substance. And the response Carlson received to his email was a recommendation to get independent testing done. The evidence shows Carlson had been doing that. See Govt. Ex. 166 excerpt and Def. Ex. 4, at AJA, A4-A7.

### **\*54** *Summary*

The Court's order denying Carlson's motion for acquittal merely said that "Here, the Government offered evidence that was more than sufficient to sustain each conviction" (DCD 362, p. 6). The Court did not even attempt to discuss the above-discussed evidence. The court erred in denying Carlson's Rule 29 motion and his Count 18 conviction must be vacated for insufficient evidence, because no reasonable jury could have found Carlson guilty on the evidence presented.

### **\*55  VII At sentencing, the District Court clearly erred when it applied the THC-to-marijuana conversion ration of 1 to 167 to determine Carlson's offense level, and when it added two levels because it believed Carlson had used firearms in connection with the drug offenses.**

### *Standard of review*

This Court reviews a court's construction and application of the Sentencing Guidelines *de novo*, and its factual findings for clear error. *United States v. Godsey*, 690 F.2d 906, 909 (8th Cir. 2012).

### *The drug-conversion issue*

AM-2201, UR-144 and XLR-11 are not listed in the Sentencing Guidelines' 2D1.1, so to determine Carlson's offense level on the analogue counts the Guidelines direct the court to use the marijuana-equivalency of the most closely-related controlled substance referenced in the Guidelines, per Guideline 2D1.1, App. Note 6. The jury decided these substances were JWH-018 analogues, but the Guidelines do not list JWH-018.

This brought into play 2D1.1's App. Note 6's three factors. In applying them, the PSR relied on the trial testimony of Government witness Dr. Jordan Trecki, and based on that used THC as the most closely-related controlled substance. PSR, para. 86.

 **\*56**  The Guidelines require the drug quantity to be converted to marijuana at a set ratio. One gram of THC equal 167 grams of marijuana. 2D1.1. The offense-level for the three above-listed substances, level 38 (30,000 kgs. or more of marijuana), resulted from multiplying the gram quantities of these three substances by 167, which yielded 217,497 kgs. of marijuana (PSR paras. 87, 97).

Before sentencing, Carlson objected to calculating his offense level and Guideline range by using THC as the substance most closely related, and that even if it were used, the ratio at which THC converts to marijuana (1:167) could not be used (Carlson Sentencing Memorandum, DCD 415, pp. 2-4). If THC were to be used (as opposed to a straight 1:1 conversion to marijuana), Carlson asked for the lower 1:7 conversion ratio discussed ahead. *Id.*

The District Court did use THC as most closely-related, and adopted the marijuana-equivalent quantity the 1:167 ratio produced. Carlson does not concede that the most closely-related substance listed in the Guidelines to AM-2201, UR-144 and XLR-11 is THC, but even if it were, the Court erred in applying the 1:167 ratio instead of the much-lower, scientifically-supported 1:7 ratio.

### *\*57  The Court erred in using the 1:167 ratio*

217,497 kilograms of marijuana, produced by use of the 1:167 ratio (PSR, para. 87), is mind-bogglingly irrational. One reaches the highest offense-level in 2D1.1 -- level 38 -- for an offense involving 30,000 kilograms of marijuana.

The first reason the Court erred in using the 1:167 ratio is because it appeared to think that if it found that THC was the closest Guideline-listed substance to AM-2201, UR-144 and XLR-11, this automatically resolved Carlson's objection to this ratio's use. It did not. But in the same sentence that the court said "... the government has met it burden to establish that the pharmacological effects of synthetic cannabinoids are similar to the effects of pure THC and... the 167 ratio should apply.") (Sent. trans., 170, line 24).

But finding the former does not make mandatory the latter, because the Guidelines are advisory to the Court, not binding. No reason exists why a court, if presented with credible scientific evidence that a different ratio makes more sense, could not apply the different ratio. And the Government, though presenting an argument why THC should be used as the referenced drug, provided no defense of the 1:167 conversion ratio itself. It couldn't, since the Guidelines Commission has never said how it derived it.

 **\*58**  And Dr. Trecki testified only about the three alleged analogues here being pharmacologically similar to THC, not that the 1:167 ration had any legitimate basis. And he admitted that he did not know how the Guidelines Commission came up with it, and knew of no scientific basis for it (Sent. trans., 102).

Carlson, however, presented compelling evidence that the 1:167 ratio lacked factual and legal support. Defense expert Dr. Cozzi in his declaration and his testimony said that the widely disparate 1:167 ratio incorrectly assumes that marijuana has a very low level of THC, so that a gram of marijuana would be only six-tenths of one percent THC (Sent trans., 62; Cozzi Declaration,

DCD 418, at AJA, A14-A15, para. 5c-d). But marijuana with that THC-level is not what people use to get high; its use is mainly industrial, like making hemp rope or cloth, or other hemp products. *Id.* The marijuana used to get high is typically 13-percent THC. *Id.*

Cozzi obtained this 13-percent figure from Dr. Mahmoud El Sohly, director of marijuana potency at the University of Mississippi (Sent trans., 63). El Sohly supervises a farm that is the only authorized source for marijuana used by the National Institute of Drug Abuse (Sent trans., 63). El Sohly's researchers also assess the potency of marijuana seized by federal agents, which is 13-percent. *Id.*

 **\*59**  And El Sohly knows that numerous other scientific and media sources that marijuana used for psycho-active purposes ranges from 3-5 percent THC to 15-20 percent (Sent. trans., 63) Medical marijuana used in States that allow it ranges at its high-end from 15-18 percent THC. *Id.* El Sohly thus believes that 13-percent THC potency for marijuana used for psychoactive purposes is valid (Sent trans., 64).

El Sohly's information about the THC concentration in marijuana appeared in a CNN.com article, but Cozzi said that hardly affects its validity, since he is a Ph.D. researcher for the Government, analyzes THC content as part of that job, and has made scientifically-credible statements about it (Sent trans., 87).

The Guidelines' ratio hence does not square with marijuana's THC content (Sent. trans., 85). Cozzi in his declaration therefore determined that the conversion ratio for the substances involved here should be far lower than 1:167 (Sent. trans., 84). Using the Elsohly-reported marijuana-THC content, Cozzi calculated a ratio of 1:7 (one gram of THC equals 7 grams of marijuana) (Sent. trans., 84; DCD 418 Cozzi Declaration, para. 5c-d, at AJA, A14-A15.

Again, the 1/167 ratio, converted to reflect a THC-percentage results in one gram of marijuana being six-tenths of one percent THC (1/167 x 100 = 0.6%). Because the THC content of marijuana cultivated to get a person high is actually  **\*60**  13-percent, not.6-percent, the Guidelines assume a marijuana THC-concentration 22-times too low (13%/.6% = 22) (Cozzi Declaration, para. 5.d(i)-(ii), at AJA, A15). Correspondingly, the 1:167 conversion ratio is 22-fold too high. *Id.* It should be 1:7 (167/22 = 7.59). *Id.* The 7.59 denominator reflects the 13-percent THC concentration (1/7.59 = 13.1%).

And based on Jessie Mercado's testimony in this case, Cozzi extrapolated from it and came up with an even lower ratio (Sent. trans., 84; DCD 418, Cozzi Declaration, para. 5.e, at AJA, A15), and calculated a ratio of 1:5.25 for AM-2201, 4.2 for UR-144, and 1:4.2 for XLR-11 *Id.*

Cozzi in deriving the even-lower alternative ratio compared AM-2201, UR-144 and XLR-11 to JWH-018, not THC, because he was not aware of any studies comparing these substances to THC (Sent trans., 82-83; Cozzi Declaration, para. 5, AJA, A14-A15). But this makes no difference. JWH-018, as the PSR states in para. 86, is not listed in 2D1.1, either. So if a sentencing range had to be calculated for a person who distributed JWH-018, it would have to be determined by the conversion ratio for the substance listed in the Guidelines to which JWH-018 most closely relates.

And because the alleged analogues, AM-2202, XLR-11 and UR-144 were compared to THC under the 2D1.1, App. Note 6 factors, little doubt exists that  **\*61**  JWH-018 -- of which these three substances were determined to be analogues -- would be compared to THC under those factors, as well. And Cozzi did not even need to rely on Mercado's testimony to arrive at the 1:7 ratio. He calculated it using just the THC content of marijuana as reported by Elsohly's program.

The 1:7 ratio has factual and scientific support, but no one knows where the 1:167 ratio came from. And it is just non-sensical to use a ratio that yields a 217,497 kg. marijuana equivalent, a number stratospherically above the highest marijuana-quantity the Guidelines use, 30,000 kgs (level 38). A drug-quantity so far above 30,000 kgs. would make sense for a Colombian drug lord, but not Carlson and his offense conduct. The 1:167 ratio shows arbitrary, thoughtless guesswork.

Hence, the District Court, presented with a valid scientific argument supporting a 1:7 ratio, and not having any scientific support for the 1:167 ratio, or any evidence from the Government to support it, clearly abused its discretion in applying the latter.

### *The firearm enhancement*

The PSR at para. 99 recommended a two-level increase under 2D1.1(b)(1) because 28 firearms were found at Carlson's business (LPOE), and because during **\*62** execution of a search warrant on Sept. 12, 2011 officers recovered a.45 caliber handgun from Carlson's person.

Carlson objected, citing his St. Louis County permit to lawfully carry a handgun on his business premises, and that the other firearms were by and large in a safe on the floor below retail level (PSR Objections, DCD 406, paras. I.M and N). The latter were a gun collection, cased and unloaded, and had nothing to do with the business (*Id.*, para. N).

And Carlson pointed out that Minnesota does not have a firearms registration requirement separate from the permit-to-carry law, and that no evidence had been presented at trial that any of the firearms, apart from the one he was carrying, was registered to him *Id.* The Government asked the Court to impose the enhancement, but presented no evidence showing how the gun had been used in connection with the drug offenses (DCD 412, pp. 24-25).

The Court applied the enhancement, stating that at trial the Government had shown that "it is not clearly improbable that the firearms were connected with the drug offense," and cited Carlson's carrying the handgun when officers arrived to execute a search warrant (Sent. trans., 168).

### **\*63** *The District Court clearly erred*

For the 2D1.1(b)(1) enhancement to apply, the Government had to prove by a preponderance of the evidence that a weapon was present, and that it was not clearly improbable that it had a nexus to the drug offense. *United States v. Perez-Guerrero*, 334 F.3d 778, 783 (8th Cir. 2003). A nexus is "a temporal and spatial relation between the weapon, the drug trafficking activity, and the defendant." *Id.*, 334 F.3d at 783.

No nexus existed because the circumstances of Carlson's possession do not fit with what the 2D1.1(b)(1) enhancement was intended to address. Carlson was not guarding a stash house, or trying to protect himself while making a drug deal. His store openly sold substances he believed, and told people he believed, were legal. And he legally sold numerous other goods, including adult novelties, t-shirts, and various tobacco products (Vol. IV, p. 681).

Furthermore, many people, like pharmacists or gun store employees, carry a gun at work, which in Minnesota they may do so legally, even without a carry-permit. And the large crowds Carlson's business attracted (Vol. IV, p. 545), it made sense to have a gun available. Carlson's carrying a gun was a store-owner exercising the right to lawfully carry a handgun for protection of self, store and employees.

**\*64** This is unlike what 2D1.1(b)(1) applies to, particularly as to the gun collection found in the basement at Carlson's store, most of which was in a safe. Their possession comes under the 2D1.1(b)(1) Application Note 11 example of clear improbability that the weapon had a connection to the offense: a person arrested at his or her residence has an unloaded hunting rifle in the closet.

Here, the clear improbability that the firearms were connected to illegal drug activity is stark. And the Government put on no evidence that would otherwise have shown a connection. The Court therefore clearly erred in applying this 2D1.1(b)(1) two-level increase.

### The sentencing errors prejudiced Carlson Firearms enhancement

Carlson's Guideline offense-level without this increase is 44 (life). The Court sentenced him to 210 months, well below that. But one cannot assume the Court would not have varied downward even more had the Court not had level 46 (life) as the starting-point. A gun enhancement is an obvious reason not to grant as great a variance as a court otherwise would, so this erroneously-applied enhancement prejudicially impacted the extent of the downward variance from the range of life. The enhancement must be set aside, and the case remanded for re-sentencing.

### *65  Prejudicial effect of the 1:167 drug ratio

Here, too, the variance does not negate the Court's error in denying Carlson's request to use a 1:17 ratio. If the Court had used the 1:7 ratio, Carlson's offense level would have been 36 (10,000 kgs. or more of marijuana). The level results because 1,203,380.1 gms. x 7 = 9,116.6 kgs. for the synthetic cannabinoids, plus 4,024.938 kgs. for 4-FA (para. 88), plus 764.499 kgs. for 5-MeO-DALT (para. 89) = 10,903.66 kgs. total.

At level 36, and zero criminal score (PSR, para. 121), and adding the other eight levels Carlson received, the offense level is 44 (life). Without the two-level firearm enhancement, he would be level 42 (360 months to life). Though these are not large decreases, the level 46 the Court used as the variance starting-point resulted from the improperly inflated drug-quantity for the synthetic cannabinoids. That quantity, combined with the total offense level of 46 (life), certainly affected the extent to which the Court was willing to vary.

Had the variance starting-point been level 44 or 42, *and* the total drug quantity been the marijuana-equivalent 10,903 kgs., not 222,286 kgs., a Court would have been more amenable to a variance that would have produced a sentence lower than the 210 months imposed here.

 *66  Furthermore, Carlson's longest sentences were on the analogue convictions counts, 18, 21, and 22-30, 210 months for each (Judgment, DCD 423, at App. Add. 3). The next highest sentences were on the money-laundering counts, 33-55, at 120 months each. All counts were concurrent. Therefore a greater downward-variance from the range applicable to the analogue counts drug would have lowered the total sentence.

### The Court's statement that it would have imposed the same sentence.

The Court said that it would have imposed the same sentence had it sustained Carlson's above-discussed sentencing objections (Sent. trans. 177). But this statement has no binding legal effect that we can find. And these sentence-insulating statements are not proper because, if given effect, they would significantly deprive this Court of its authority to review sentences, particularly where the court granted an upward or downward variance. [9]

And statements like the Court made, if honored on appeal, would permit improper sentencing practices to abound and go uncorrected. However, a  *67  correctly-calculated Sentencing Guideline range is the cornerstone of a validly-imposed sentence.

Even if a court really would not change a sentence despite being reversed on appeal, that would not give validity to the Court's above-referenced statement, because sentences have consequences apart from duration. For example, a firearm enhancement can affect an inmate's BOP custody level and designation, and it also makes one ineligible for drug treatment (RDAP) (see 28 CFR 550.58(a)(1)(vi)(B) and *Stevenson v. FCI Waseca*, 383 Fed.Appx. 587 (8th Cir. 2010). And Carlson has a history of marijuana use (PSR, paras. 147-150).

Lastly, it lacks plausibility for the Court to says its sentence would not change if it had granted Carlson's objections, particularly the objection to use of the 1:167 conversion ratio. The Court cited as a 3553(a) factor underlying its sentence "the amount

UNITED STATES OF AMERICA, Appellee, v. James..., 2015 WL 512624 (2015)

of controlled substance analogues at issue...” (Sent. trans., 176). Therefore, the marijuana-equivalent of 9,116.6 kgs. for the analogues AM-2201, UR-144 and XLR-11 should favorably impact Carlson at a re-sentencing, given how much lower a quantity it is than 217,497 kgs.

And the firearms enhancement had to have effected the sentence because it exists to further punish defendants when firearms are connected to their drug **\*68** crimes. The Court would not have imposed it and ignored it in deciding sentence duratio

### Summary

The District Court clearly abused its discretion when it used the 1:167 conversion ratio, and doing so prejudiced Carlson. If his convictions are not set aside, his case should be remanded for re-sentencing, with directions to apply the 1:7 ratio to calculate the Guideline range, and to re-evaluate the variance it granted after applying the ⚑ 18 U.S.C. 3553(a) sentencing factors -- which included the factor of drug quantity -- in light of the lower drug quantity and the absence of the two-level increase for a firearm.

**\*69  VIII The final forfeiture order and forfeiture judgment and money-laundering convictions must be vacated if the drug-count convictions on which they are predicated are reversed.**

### Standard of review

The permissibility of a forfeiture and of convictions that depend on the validity of other convictions, later reversed presents a legal question, to which *de novo* review applies. *Garionas v. Newton*, 827 F.2d 306, 309 (8th Cir. 1987).

### Basis for relief

The Amended Superseding Indictment (DCD 281) alleges in para. 47 that the money-laundering convictions on count 33-55 depend on the specified unlawful activity charged under ⚑ 21 U.S.C. 841 and ⚑ 846 (counts 18 and 21-30). If the latter convictions are reversed, the basis for the count 33-55 convictions would not exist, and they must be vacated.

Under ⚑ 21 U.S.C. 853, the amended final forfeiture order (DCD 430) and the forfeiture judgment (DCD 434) depend on Carlson's convictions on the drug-counts (18 and 21-30), so their reversal would require vacating the order and judgment.

 **\*70**  If fewer than all of counts 18 and 21-30 were reversed, a remand should be ordered to enable the court to determine the extent to which counts 33-55 and the final forfeiture order and judgment are viable.

### CONCLUSION

The unconstitutionally vague analogue statute requires vacating Carlson's analogue-count convictions (21-30). Absent that, exclusion of Carlson's entrapment defense, or use of inadmissible expert-testimony, or the erroneous analogue-elements instruction requires reversal on those counts, and on the money-laundering counts (33-55) and final forfeiture order and judgment, which are predicated on the count 18-30 convictions. Insufficient evidence of distribution of a scheduled controlled substance requires vacating (count 18). The erroneous misbranding instructions require reversal on counts 1-17.

**Appendix not available.**

# Footnotes

1 The statutes cited in these counts are in the Judgment, at Appellant's Addendum, Add. 2.

2 "Vol." refers to the trial transcript.

3 "**REDACTED**" appears in Carlson's original presentation of this article in his *in limine* motion.

4 Reprinted here with permission of the Associated Press.

5 Carlson's defense-preclusion issue here does not rest solely on the Court's incorrect belief that he had to show an intent to entrap. The Court's other, above-discussed reasons suffice to support relief.

6 Defense Ex. 4 duplicates what the Court had previously received as Defense Ex. 1 (Vol. I, p. 355, Def. Ex. 1). The duplication is discussed at Vol. VI, 1107, when the Court received Def. Ex. 4).

7 Counts 19 and 20 alleged distribution and possession with intent to distribute AM-2201 on July 12, 2012 and between July 9 and 25, 2012, respectively, after this substance had been scheduled. But the jury acquitted Carlson on these counts. See Verdict (DCD 299, p. 8). Furthermore, even if Carlson had not been acquitted, the dates charged in these Counts are immediately after AM-2201's scheduling, July 9, 2012 (Vol. XI, 2524). So even though Carlson was returning products containing banned substances, products containing AM-2201 after its scheduling date could inadvertently have remained.

8 This Exhibit is no longer available, but the Government agrees the copy in our Appendix can be used.

9 In *United States v. Fiorito*, 640 F.3d 338 (8th Cir. 2011) (Appellate case 10-1969) the sentencing court said that even if it had erred in determining the Guideline range, it would still impose the same sentence. Fiorito's brief pointed out the statement's lack of legal support. This Court affirmed the sentence, but only after addressing the issues it raised, and made no mention of the sentencing court's statement. *Id.*, at 351-53.

---

End of Document               © 2023 Thomson Reuters. No claim to original U.S. Government Works.