IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 21-cr-00115-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. ERIC MORTENSEN,

    Defendant.

---

## GOVERNMENT'S SENTENCING STATEMENT

---

The United States of America, by and through the undersigned Assistant United States Attorney, hereby submits the following sentencing statement with respect to defendant ERIC MORTENSEN. For the reasons described below, the Government respectfully requests that the Court sentence the defendant to a total of 248 months' imprisonment, which is a sentence at the bottom of his Guidelines range.

### Facts

The facts in this case are amply outlined in the parties' plea agreement (ECF #78) and the presentence investigation report ("PSR") (ECF #83) and so will be repeated only in brief here.

From at least August 2020 to March 2021, the defendant and his co-defendant, Melissa Charran, stocked, sold, and distributed dispensary-grade marijuana and THC products from their apartment in Denver. They advertised their product on a particular social media account (the "Social Media Account") and sold the marijuana and THC to customers around the United States.

1

The defendant and Charran took steps to obfuscate their activity in an effort to evade law enforcement detection. For instance, they used the business name "European Auto Parts" when mailing parcels. The defendant used aliases, including "Jacob Bradford" and "Jason Sanborn" during the course of conduct.

The defendant also used firearms in furtherance of his drug business. On the Social Media Account he used to advertise the marijuana, the defendant repeatedly displayed firearms in an effort to ward off individuals who might wish to do him harm. Stills from two such videos (of many) posted to the Social Media Account on January 8, 2021, and March 19, 2021, are as follows:

  

Law enforcement executed a search warrant at the defendant and Charran's apartment on March 25, 2021. Inside, they located a well-organized retail store of marijuana and THC products, ready to ship, as well as packaging materials to facilitate

2

shipping, as follows:






Finally, also during the search, officers located four firearms, including the ones that the defendant had displayed in his videos.  Three of the four guns recovered from the apartment had been purchased by Charran, but it is clear that the defendant possessed them, and used them in furtherance of the drug offense.

The defendant was arrested the same day as the search warrant execution.   At

3

the time of execution of the warrant, the defendant was outside walking his dog.  As officers approached him, he dropped his dog's leash and attempted to flee on foot.  Ultimately, officers were required to tackle the defendant, causing superficial injury to both the defendant (who had to be taken to the hospital) and an officer.  The dog was ultimately recovered and turned over to the defendant's friend.

The defendant made a significant amount of money from his drug business.  He often displayed his Coinbase account on the Social Media Account, showing balances of hundreds of thousands of dollars in bitcoin.  Records obtained from Coinbase revealed that he had sold over 44 bitcoin from the account which, at the time, was equivalent to around $1,000,000.

## Procedural History

The defendant and Charran were charged by criminal complaint on March 24, 2021 and were arrested the following day.  ECF #1, 2.  The defendant made his initial appearance in this case on March 26, 2021.  ECF #15.  The court held a detention hearing on March 31, 2019, after which the defendant was ordered detained.  ECF #19, 20.  The defendant was indicted on April 7, 2021.  ECF #23.

On July 22, 2022, the defendant pled guilty to Counts One, Four, and Five of the Indictment, pursuant to a plea agreement.  ECF #77, 78.  The defendant is scheduled to be sentenced on March 31, 2023.  ECF #86.

The defendant has been in custody since his arrest.

## Guidelines Calculation

The Government believes the defendant's Guidelines range is correctly calculated as enumerated in the PSR, which differs from the Government's calculation

in the plea agreement only in that the PSR correctly groups Counts One and Five.

In particular, the PSR correctly calculates the converted drug weight as 1,251 kilograms, for a base offense level of 30. PSR ¶ 26. As described in the PSR, this drug weight is an estimated converted drug weight based on the amount of THC and marijuana products that the defendant and Charran sold during a representative month during the duration of the conspiracy. PSR ¶ 20. The defendant did not file an objection to this drug weight calculation in the PSR.

Two levels are added pursuant to U.S.S.G. § 2D1.1(b)(7) for distribution of a controlled substance through mass-marketing by means of an interactive computer service. Here, the defendant advertised his product to everyone on his Social Medial Account friends list. He interacted with his customers via social media, displayed product for sale, and reported on the status of shipping in the same manner, as follows:





For instance, in the lefthand screenshot above, the defendant displayed a photo of a

USPS parcel and reported "TD in Chaska, thanks boss." Here, the defendant was reporting the "touch down" of a parcel of controlled substances in Chaska, Minnesota and thanking that customer for his business. In the other two photos, the defendant was advertising product he had in stock for sale. Customers could interact with the defendant on the Social Media Account to place their orders and the defendant could respond in the same manner. Accordingly, the U.S.S.G. § 2D1.1(b)(7) enhancement is applicable.

The PSR also correctly applies the two-level U.S.S.G. § 2D1.1(b)(12) enhancement for maintaining a premises for the purpose of manufacturing or distributing a controlled substance. The locus of the defendant's drug business was his apartment. The defendant or Charran purchased drugs from dispensaries and brought the drugs home to store in preparation for sale. The defendant communicated with his customers from his home and sorted and packaged the drugs from home. He then left from his home to take the drugs to the post office to mail to his customers. Every single drug transaction in which the defendant engaged took place at least in part from his home.

Further, it is well-established that simply because a defendant is also living in a premises as his primary residence does not mean that the U.S.S.G. § 2D1.1(b)(12) enhancement is inapplicable. In <u>United States v. Murphy</u>, 901 F.3d 1185 (10th Cir. 2018), the Tenth Circuit rejected an argument that the enhancement was inapplicable to a defendant who used the premises as a primary residence but also conducted two drug sales out of his home. As described above, the defendant in the instant case conducted *all* of his drug sales out of his home; the defendant's residence was the only

6

place out of which his drug business was conducted. And, importantly, this was a business that was the defendant's only (or primary) source of income. Murphy, 901 F.3d at 1193 ("In addition, Murphy's circumstances during the relevant time are relevant. He had no legitimate employment or other identifiable and legitimate source of income. Drug-trafficking (and theft) seem to be his main, if not sole, source of funds (and a substantial one, at that)."). Accordingly, the U.S.S.G. § 2D1.1(b)(12) enhancement is applicable.[1]

Based on these calculations, the Government believes the defendant's total offense level is 31 and his criminal history category is VI. His Guidelines range is therefore 188-325 months' imprisonment on Count 1, 120 months' imprisonment on Count 5, to be followed by a mandatory 60-month sentenced imposed on Count 4.

## Application of the 18 U.S.C. § 3553(a) Factors

For the reasons that follow, the Government respectfully requests that the Court sentence the defendant to 188 months on Count 1 concurrent to 120 months on Count 5, to run consecutive to 60 months on Count 4, for a total of 248 months' imprisonment.

A. *Nature and Circumstances of the Offense*

Although the defendant sold "just" marijuana and THC, the offense was nevertheless very serious. As an initial matter, while use of marijuana is legal at the local level in Colorado and other states, it is unquestionably unlawful for the defendant to purchase it in Colorado—at times, using Charran's medical marijuana card—and then sell it to people in other states. Anytime an individual sells illegal drugs to others, he is

---

[1] The defendant did not object to the PSR's application of the U.S.S.G. § 2D1.1(b)(12) or § 2D1.1(b)(7) enhancements.

7

harming individuals in the community.

What makes this offense particularly serious, however, is the defendant's brazen and reckless use of firearms in furtherance of the offense. As noted above, the defendant often bragged on the Social Media Account about how much money he was making by selling marijuana. And, the defendant did not hide his identity on the Social Medial Account. Should someone have wished to harm the defendant, force him to hand over bitcoin, or steal the ample stores of marijuana he kept at home, it would have been a fairly simple task to locate the defendant. Accordingly, it is not surprising that he juxtaposed numerous firearms alongside his social media posts that concerned money and drugs to appear intimidating to anyone who wished to cause him harm.

The law imposes harsh sentences on drug dealers who use guns in furtherance of their business. This is because any time a drug dealer (and, in this case, a prohibited person) uses firearms to ward off would-be robbers, the neighborhood and community are made substantially less safe. For the defendant's wanton and irresponsible criminal conduct, he deserves a lengthy term of imprisonment.

B. History and Characteristics of the Defendant

The defendant has an extremely lengthy criminal history spanning nearly two decades, starting when he was 16. PSR ¶ 37. Notably, the defendant's criminal history is *not* one that is defined by drug use and merely punctuated with acts of violence or other offenses. Rather, the defendant's criminal history paints a disturbing portrait of a violent man with no respect for the individuals around him—particularly women and law enforcement officers.

When the defendant was just 17, he sustained his first conviction for assault.

When he was 18, instead of pulling over for officers when he was speeding, he sped off and tried to hide. Also at age 18, the defendant committed 3rd degree burglary and, for the first, spent time in jail. It was also the first time he violated his probation. A year later, at age 19, the defendant again absconded from police when officers tried to pull him over for driving without a license. Following the sentence for this offense, he violated his probation multiple times—a pattern that became a regular occurrence during his times on probation.

In 2009, at age 20, the defendant began what became a lifelong pattern of domestic abuse—this first time as to an assault on his brother. The defendant was arrested a second time for domestic assault in 2009. In 2010, the defendant was convicted of 3rd degree assault for throwing a liquor bottle at a woman, hitting her in the head and causing injury. In 2010, the defendant was arrested for violating an order of protection that was in place for domestic abuse.

In 2012, the defendant was convicted of making terroristic threats and obscene or harassing phone calls—conduct that was designed to harass the defendant's girlfriend at the time. In 2012, the defendant was convicted of stalking and sentenced to 42 months in prison—his longest sentence to date. In this incident, the defendant was following his ex-girlfriend, who had a no-contact order in place against the defendant. The defendant threatened the ex-girlfriend with violence and subsequently fled from law enforcement (and, subsequent to that, tried to flee from the hospital where he was taken after crashing his vehicle during the chase). Shortly thereafter, also in 2012, the defendant was convicted for violating a no-contact order and sentenced to 27 months in prison.

In 2013, the defendant was convicted of giving a false name to a police officer and, in separate case in 2013, of receiving stolen property.  In 2014, he was convicted of 3rd degree damage to property.  In 2014, the defendant was convicted of 5th degree assault for assaulting his then-girlfriend by choking her until she was unconscious.  Finally, in 2019, the defendant was convicted of driving under the influence.

As noted in the PSR, the defendant also has six outstanding cases with active warrants: three in Denver County Court, One in York County Court in Nebraska, and two in Wright County Court in Minnesota.

This case, then, is yet another in the defendant's life of serious criminal activity and utter disregard for the law.  Indeed, the defendant missed being counted as a career offender in this case *only* because he was not convicted of a violation of 21 U.S.C. § 841(a)(1), as charged in Count Two of the indictment.  *See* Plea Agreement, ECF #78 p.10 n.2.  Given the defendant's lengthy and unbroken criminal history, a substantial sentence of incarceration is warranted.

Further, as noted above, in the instant case, the defendant attempted to flee from police officers when he was approached to be arrested.  This is, of course, simply the latest such incident in a lifetime of committing crimes and attempting to evade the police.  Perhaps not surprisingly, it is not even the first time that such an attempt resulted in a trip to the hospital for the defendant.  The defendant's unbroken pattern of criminal activity followed by utter disregard for law enforcement and the courts counsels in favor of a sentence within the Guidelines range.  Ultimately, the defendant's history and characteristics make a downward variance inappropriate in this matter.

*C. The Need for the Sentence to Achieve the Aims of 18 U.S.C. § 3553(a)(2)*

The requested sentence will also reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, provide deterrence to criminal conduct, and protect the public from further crimes of the defendant.  While the defendant has an extensive criminal history, his longest sentence to date was 42 months.  Hopefully, a lengthy sentence of incarceration here will serve these purposes of sentencing and deter the defendant from future crimes.

## Conclusion

The Government respectfully requests that the Court sentence the defendant to 248 months' imprisonment.

Respectfully submitted this 17th day of March, 2023.

COLE FINEGAN
United States Attorney

By: *s/ Andrea Surratt*
Andrea Surratt
Assistant United States Attorney
U.S. Attorney's Office
1801 California St., Suite 1600
Denver, CO 80202
Telephone: (303) 454-0100
e-mail:  Andrea.Surratt@usdoj.gov
Attorney for the Government